FRANK COOPS, ADMINISTRATOR OF THE ESTATE OF PAUL
UHLENBERG, DECEASED, v. THE LAKE SHORE &
MICHIGAN SOUTHERN RAILWAY CO.

*Negligence—Custom—Directing verdict—Contributory negligence.*

In this case it is held that upon the testimony a verdict should have
been directed for the defendant, and that the deceased was guilty
of such *negligence* as would preclude a recovery, and that the
defendant's duty towards him was measured by its duty towards
men skilled in the work undertaken by him, and in the attempted
performance of which he met his death. An examination of
the opinion is essential to a correct understanding of the case.

Error to superior court of Detroit. (Chipman, J.)
Argued April 26 and 27, 1887. Decided June 23, 1887.

Case. Defendant brings error. Reversed. The facts are
stated in the opinion.

*William H. Wells,* for appellant.

*W. L. Carpenter,* for plaintiff.

SHERWOOD, J. The plaintiff, as administrator of the
estate of Uhlenberg, recovered a judgment in the superior
court of Detroit for $5,287, as damages for killing his intes-
tate.

Uhlenberg at the time of his death, and for some time
previous thereto, was employed by the Peninsular Car Com-
pany at Detroit to make brakes at one of its shops. When
he was killed he had crawled between the wheels of a truck
under the hind car, going in at the side of the car. The
wheels passed over and crushed him.

The company was engaged in the manufacture of freight
cars, and had its grounds and shops contiguous to the tracks

of the defendant, but defendant had no interest in the car company's works. The defendant had several tracks entering the car company's grounds, and connecting with its main track, which were used in carrying material to the car company's shops in different parts of its yards, and for removing new cars out when completed. The erecting shop of the car company was very large, and in this the cars were completed. This building contained eight parallel tracks, on which the cars were set up, all of which converged to the switch on the outside, connecting with the defendant's main track. The company's grounds extended about ten car-lengths from the car-erecting building, where there was a boundary fence, and the switch was some distance beyond that, and the track curved to the west from the building to the switch. The finished cars were delivered to the defendant for shipment outside the erecting shop into the yard. The defendant was accustomed to enter daily into the grounds and yard of the car company, with its trains, either taking material to the car company, or for the purpose of taking out new cars which were designated as ready to go.

On the twenty-eighth day of May, 1886, the defendant's switching crew were engaged in taking out the new cars ready to go. Seven new cars were ready for shipment. The defendant's engineer first hitched on to quite a number of cars in the company's yard, which had been emptied of material taken to the car company's shops, and stood on the material track. After these had been attached to the engine, it moved out, and backed up to the place where the seven new cars stood, and made connection with those. The new cars had stood upon the track, coupled together, all day previous to starting. After these cars were coupled on and moved forward a few feet, the engineer stopped his train, and waited a few minutes for one of the defendant's regular trains to pass, before entering the main line. The curve

upon which the train then stood was such as to prevent the engineer's seeing the back end of his train.

The evidence tended to show that it was customary for the car company to examine and look after the new cars up to the time they left its yard, and if anything had been omitted, or a defect was discovered, to remedy it outside of the shops, and, if it could be done, do the work on it as the the car stood upon the track; and of this custom the defend-ant's servants, as well as those in the service of the car company, were familiar:

It was while this train stood thus waiting that Uhlenberg, in obedience to the direction of one of the men in the employ of the car company, went to the hind car, and attempted to put a nut lock thereon, by getting in between the wheels of the hind truck from the side. He did not know that the new cars were coupled to the defendant's train, and could not see the engine from the rear car that he went under. The testimony tends to show the train stood there about 15 minutes after the new cars were coupled on.

The main question was whether the defendant was guilty of negligence; and this can only be known when it is ascertained what was necessary for the defendant to do before starting its train, after having coupled on the new cars, if anything, and, if so, was it done?

It appears the conductor of the switching train was a very competent man, and had held the position a long time; had been in the employ of the company 14 years. He testified that he was accustomed to do the car company's business in its yard, and said:

" There is a straight track along the east side of the car company's yard, on which I put my loaded cars. They are unloaded at different places. Then I go in and take the empties out. The empties stand on different tracks. I get them back, and then pull out, and then come where the new cars stand on the eight tracks. When I get my empties all

coupled up, I come to the new cars, couple them, and pull them all outside the yard.   *   *   *

" In all cases I see Mr. Weiss [assistant superintendent of the car works], and ask him what new cars are to go out. The day before the accident happened, I saw Mr. Weiss, and asked him what was to go, and he told me there were seven Union Steel cars, and showed them to me.  I coupled them up, and pulled them outside the gate on the Lake Shore track, outside the yard, between 4 and 5 o'clock P. M.   Usually did that work at that time every night.  Those cars were intended for the freight train that left then at 6:30 o'clock. They did not go that night. I heard the next morning, the reason was that they were not billed.  The next morning I came along to do some work in the car company's yard.  Those cars were in my way, and we shoved them in on No. 2 track. It was not the track I had taken them from.  I had made them up from different tracks,—three or four.  There were seven in all.   *   *   *   At that time they were coupled together.  I coupled them the night before.  This was about half-past nine in the morning.   *   *   *

" I saw Weiss when I first came in the yard, about half past two o'clock.  Asked him what new cars were going that night.   He told me those seven Union Steel cars were ready, and there was one other, No. 100, on the track east of the erecting shop.   *   *   *

"After I got these cars all together, and had coupled on this new car, I told my switchman to go ahead and back in on the seven.   I then walked over to the back end of the seven cars. I then looked them over as I went along, to see if those cars were all coupled.  I walked up and along the east side of them.   I passed along by the side of the cars.   There was nobody working upon these seven cars when I passed along by them.  I observed that particularly when I walked up to see if there were any men working around them.  I did not see anybody working on them, or anywhere near those cars, at all.   I then coupled on, and gave the signal to my switchman to pull the cars out of the yard.  Just as I gave that signal, the signal of the train at the Bay City crossing was given, coming towards the city.  That train was on our main track.   I had to use that track in order to pull those cars out of the yard.  Then my switchman gave the engineer a signal to stop.  When we stopped the train had moved a car-length or two.  The switch at that time was placed for us to pull out on the main track.  I was at a point just outside the gate, looking towards the engine.  My cars moved right

out immediately after the train passed. I gave the signal to start at that time. The engineer rang his bell, and started the train, and when the car moved about a car-length or more we heard a hallo, a noise from the hind end of the hind car, and I gave a signal to stop, as quick as possible, and we did it. The signal is given by hand from conductor to engineer. There is no signal given, any more than the engineer always rings his bell before starting the engine, whether he is coupled on to cars or not. That is a precaution they take at all times. The whistle is not used up there. There is no occasion to use it. I never move any cars out of there without an order from Weiss. He did not tell me there was anything more to be done to those cars. I got my orders for those cars the day before. * * *

"From the time this train stopped, after having started the first time, until it started again, I did no go back to the rear of these new cars. * * * After Uhlenberg was killed, I went back to the rear end of the train to see what was the matter. I found Uhlenberg under the car. He was between the wheels of the truck of the last car when I saw him first. I did not know what he was doing there until I was told after the accident happened. * * *

"I frequently find, when I come to those cars, that there are men working around them, and I make observation, ordinarily, to ascertain whether anybody is working around them. Even after I pull the cars out on the track north of the yard I have seen men working at them there. * * * After I am told that cars are ready to go, I make an observation to see whether any one is working on them, and couple them up, and get ready to pull them out. After that I don't make any observations, but start the train. We do not usually hitch on, then wait a while, and then start, unless something occurs so that we have to do it."

The foregoing is *substantially* the testimony of the conductor of the train which killed Mr. Uhlenberg, and the other testimony in the case is mostly corroborative of his.

In submitting the case to the jury the court said:

"The plaintiff proceeds here upon the claim that while probably McDonald, who was in charge of the company's train, had not actual knowledge that the deceased was at work, yet that the custom of doing business between the Peninsular Car Company and the railroad company had been such that he had reason to believe that some one might

be there; that it was altogether probable, or at least possible, that some one might be there, and that therefore it was his duty, before starting, to look out and ascertain the fact. Now, that is the claim, and it is upon that basis alone that this case can go to you. There is no other ground upon which you can consider this case. So that the very first thing you are to ascertain, logically and properly, is whether the course of business between the Peninsular Car Company and the railroad company was such that the employé of the railroad company, Mr. McDonald, would have good reason to suppose that it was probable or possible that some one would be underneath the car, there making some repairs. Is that so, or is it not so?"

This clause of the charge presents the main question in the case.

The learned judge of the superior court hesitated somewhat about submitting the question of the duty of the defendant, growing out of the circumstances, to the jury, but finally did permit them to take the case, and ascertain whether or not there was a custom, known to the defendant, and arising out of the manner in which the parties carried on their transactions with each other, under which the car company's men were permitted to go under the cars to make repairs after they had been completed and turned over to the defendant to be taken to the place of their destination, and after the defendant had also coupled the new cars to its train for that purpose.

In this I think the court erred. I have discovered no testimony tending to prove such a custom; and this being the only way in which it was sought to establish the duty of the defendant, upon which reliance was placed for a verdict in favor of the plaintiff, I am clearly of the opinion that the jury should have been instructed by the court, as requested by the counsel for the company, to return a verdict for the defendant.

The evidence is uncontroverted that the defendant took control of the new cars on the evening of the twenty-seventh, and, in consequence of a little delay in procuring the way-bill,

they were not carried away that night. In the morning of the next day they were run back on the car company's track in its yard for a sh,rt time, and were then again coupled to the defendant's train, and moved out till they came to the main line, and then had to wait about 15 minutes for the Bay City train, which was approaching, to pass; and during this brief stop, Uhlenberg, unobserved by any one (except a person who happened to be in the erecting shop at the time), came to the hind car, and, without looking to see if an engine was attached to the train, laid down and crawled upon the track between the truck wheels under the car, and, while lying partially across the track, the train started, and he was run over and killed.

Before the conductor started the new cars from the yard, he went along beside the train, and examined them, and found no person under or about them. The car company had also given directions to all of its men to avoid the trains.

The order or direction given by the assistant superintendent to do the work attempted by Uhlenberg when he was killed was not given to him, but to one Ziske, who was skilled in the business, and knew better than to go under the cars without first ascertaining for himself whether there was an engine attached to the train in which he found them, and was given some time before the injury occurred, while the cars were yet unmoved and no danger existed.

Uhlenberg had never done the work undertaken by him before, and in going under the car he chose the most dangerous place he could have found, and where no one was ever seen or known to have gone before. I think, under all these circumstances, it would not be difficult to find that the plaintiff's intestate was guilty of such negligence in the premises as to preclude a recovery.

The defendant was under no greater obligation to Uhlenberg on account of his inexperience. Its obligation of care

in this case, if any, was measured by its duty towards skilled persons; and it is very clear, if he had been skilled in the business undertaken, he would not have attempted to go under the car in the manner he did, nor at the time he did. The defendant owed to Uhlenberg precisely the care it owed to an experienced man, and no more. The proper signal had been given, after the new cars were attached to the train, of the conductor's intended movements, and it was the duty of all persons about the premises to take heed to that warning at their peril. In no view that I have been able to take of the circumstances of this case have I discovered how this defendant could be made liable for the death of the plaintiff's intestate, and the court should have directed the verdict for the defendant, as requested.

The judgment must be reversed, and a new trial granted.

CAMPBELL, C. J., and CHAMPLIN, J., concurred.

MORSE, J. I concur in the result.